## 52362. ALLEN v. THE STATE.

MARSHALL, Judge.

The sole issue in this appeal is whether the trial court erred in refusing to suppress evidence seized from a pickup truck in which appellant was a passenger.

The circumstances of the seizure, as developed at the hearing on the motion to suppress evidence, were that two police officers on patrol observed a pickup truck traveling on a dirt road around 1:00 a.m. on August 8, 1975. The officers pulled behind the truck before it reached the paved highway and followed it a quarter of a mile before they turned on their blue light and stopped the truck. Prior to stopping the truck, the officers had observed that there were two or three occupants in the cab and a large piece of plywood in the bed of the truck. The truck had not been speeding or weaving or committing any traffic violations, and both officers testified that they noticed nothing peculiar or unusual about the truck. There had

been no reports of burglaries or other crimes in that area that evening. One officer stated that the reason for stopping the truck "was to identify the driver and see if he had a valid driver's license." The other officer testified that the truck was stopped for a license check. "There had been many burglaries in that area. Before it happened, I didn't know but one of them, and that was the defendant, I didn't say to myself, there goes three burglars. I just thought the truck should be stopped and the driver ID'ed and his license checked and find out what they might be doing in that area at that time of night." While one of the officers was examining the driver's license, the other officer observed on the floorboard of the truck a box of flags and some other articles outside the box. One of the articles was a stamp pad with the words "Fowler Drive School" on the outside. Subsequent investigation revealed that the Fowler Drive School had been burglarized and the numerous articles found in the truck (tape recorder, fire extinguisher, flags, staples, tape reels, pencils, etc.) had been taken from the school.

Appellant moved to suppress these articles from evidence on the ground that search of the truck and seizure of the articles violated his Fourth Amendment rights in that it was without a warrant, was not based on probable cause and was incident to an unlawful arrest. The trial court denied the motion and overruled appellant's objections to the evidence on the same ground during the trial. The jury returned a verdict of guilty of burglary and from the judgment thereon appellant appeals. *Held:*

1. Appellant first contends that the police officers had no right to stop the truck for investigation, and that, because the detention was unlawful, the seizure which followed was unlawful. He cites *Brooks v. State,* 129 Ga. App. 109 (198 SE2d 892), wherein the police officer stopped appellant's truck after it turned off the main highway onto a side road at 2:30 a.m. This court held that a bag of marijuana sticking out of appellant's shirt pocket and seized by the police should have been suppressed. The only explanation for stopping the truck was that the policeman "suspected he [appellant] might be up to something that's no good." The court found that the two

facts which might have prompted the detention, the lateness of the hour and the turning off the main road, were insufficient to give rise to an "articulable suspicion (less than probable cause, but greater than mere caprice) that the law has been violated, [and] the act of following and detaining a vehicle and its occupants must be judged as an impermissible intrusion on the rights of the citizen. Where this occurs, the penalty exacted by the law is that evidence turned up as a result of such intrusion may not be introduced against the defendant on the trial of his case."

"It is clear that in cases where there are some reasonable articulable grounds for suspicion, the state's interest in the maintenance of community peace and security outweigh the momentary inconvenience and indignity of investigatory detention." *Brisbane v. State,* 233 Ga. 339, 343 (211 SE2d 294). It is also clear that what is a "reasonable articulable ground" for the detention may be less than probable cause to make an arrest or conduct a search, but must be more than mere caprice or arbitrary harassment. *Brisbane v. State,* 233 Ga. 339, 342, supra. Each case depends on its own facts. "The point at which the routine protection of the public becomes an invasion of the right of privacy of the individual must rest on the particular circumstances involved." *Anderson v. State,* 123 Ga. App. 57, 61 (179 SE2d 286). Both *Brooks* and *State v. Smith,* 137 Ga. App. 101 (223 SE2d 30) are distinguishable on their facts.

In *Anderson v. State,* 123 Ga. App. 57, supra, the detention was held to be justified where appellant was observed driving out of a closed shopping mall at 2:00 a.m. In *Brisbane v. State,* 233 Ga. 339, supra, the court found the police were justified in stopping a car after it passed a service station a second time. See also *Tanner v. State,* 114 Ga. App. 35 (150 SE2d 189). In *Connor v. State,* 130 Ga. App. 74 (202 SE2d 200), this court held that the police were justified in stopping appellant's car which was slowly cruising through a high school parking lot where frequent thefts had been reported. In *Yawn v. State,* 134 Ga. App. 77 (213 SE2d 178), this court held that a policeman had a right to stop appellant when he saw him driving away from a closed pool hall building at 4:45 a.m.

In each of these cases the policeman's stated purpose in stopping the vehicle was to check the driver's license, or a "routine check" for identification under circumstances that appeared suspicious. In each case the court examined the facts and determined that the policeman's suspicions were well-founded and that the detention was not arbitrary or harassing.

Here the officers observed a truck traveling along a dirt road after midnight in an area where recently several burglaries had taken place. One officer testified that he knew of three or four burglaries that had taken place adjacent to the dirt road within the past 6 or 8 months. In addition, a "pinball place," which the police officers were checking out when the truck in which appellant was a passenger passed by, had been broken into twice. We cannot say that three males driving along a dirt road late at night in a high crime area does not give rise to an articulable ground for suspicion. " 'In Terry [Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889)] this court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' . . . The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' Adams v. Williams, 407 U. S. 143, 145 (92 SC 1921, 32 LE2d 612)." *Cunningham v. State,* 133 Ga. App. 305, 309 (211 SE2d 150).

2. Appellant further contends that even if the truck was lawfully stopped, the "plain view" rule cannot apply because the articles on the floorboard were not immediately identifiable as contraband. *Cook v. State,* 134 Ga. App. 712 (215 SE2d 728); *Mobley v. State,* 130 Ga. App. 80, 83 (202 SE2d 465). However, the coin collection

in *Cook* and the bag in *Mobley* are clearly distinguishable from the stamp pad in the present case. The name of the school stamped on the pad made it apparent that it, and possibly the other articles, were property of the school.

For these reasons the trial court did not err in denying the motion to suppress, and in overruling appellant's objections at trial.

*Judgment affirmed. Bell, C. J., Quillian, P. J., Stolz, Webb and McMurray, JJ., concur. Deen, P. J., Clark and Smith, JJ., dissent.*

SUBMITTED JULY 6, 1976 — DECIDED NOVEMBER 30, 1976 —
REHEARING DENIED DECEMBER 17, 1976.

*J. H. Affleck,* for appellant.
*Harry N. Gordon, District Attorney, B. Thomas Cook, Jr., Assistant District Attorney,* for appellee.

SMITH, Judge, dissenting.

The point at which the routine protection of the public becomes an invasion of the right of privacy of the individual must rest on the particular circumstances involved. Is a police officer within his rights in stopping a vehicle and conducting a minimum check of the drivers license with no objective justification whatever? *Anderson v. State,* 123 Ga. App. 57 (179 SE2d 286).

1. The writer of this dissent holds that in the first instance that the appellant under the circumstances of this case had his right of privacy invaded. In the second instance there is no law that says a police officer cannot stop a vehicle to check the driving license of the operator. However, when he does this and the purpose of the detention is to check the license only, he is confined to this act. Once the license has been checked and this check is to be confined to the operator's license, then the person so detained must be allowed to continue on his way without him or any passengers in his vehicle being questioned or detained further for any reason unless there is some ground to do so based upon something more than a mere suspicion. The stopping of a vehicle merely to check a drivers license does not within itself authorize the officer

to go beyond this and check inside the vehicle or search the person of the driver or passengers.

Facts in this case simply do not justify the officers proceeding beyond a routine license check of the driver. The facts show that the defendant and one other was a passenger in a pickup truck driven by Ronald Eugene Allen. The officers stated it was about 1:30 a.m. when they fell behind the truck on a dirt road connecting two main roads and followed it about 1/2 mile at which time they pulled it over to "identify the driver and see if he had a valid driver's license." Continuing, the arresting officer stated, "I just naturally wondered what they were doing." He stated that the driver of the truck was not violating any law and he had no reason to stop the truck other than to check the driver's license. The officer also stated that there was no reported burglary that night, nor was it shown that there had been a burglary of the Fowler Drive School reported. There was no report or evidence connecting the truck or any of its occupants with a burglary or law violation. In response to this question by the court: "How recently did these incidents (burglaries) happen"? Officer Tyson answered: "I know 3 or 4 burglaries in the past 6 or 8 months that he has had out there and like I said before the pinball place had been broken into. *I stopped the truck for all these reasons, but mainly to* check for driver's license." (Emphasis supplied.) He stated that it took him a minute to satisfy himself that the license was valid. The officer continued to question the driver after satisfying himself that the license was valid, asking him where he had been, where he was going, and who was with him.

After Officer Tyson checked the license and continued questioning the driver, Officer Cruce went around to the passenger side stating that he did not know anyone else was in the truck and found that there were two passengers. He stated that, "If you are picking somebody up at that particular time of night, *the proper procedure is to check inside of the car and see if there is anybody in there and what is going on.*" (Emphasis supplied.) He asked to see the passengers' drivers licenses and in the process the two passengers got out of the truck. The defendant and one state witness said the officer told them to get out; the officer said they got out freely and

voluntarily. After Officer Cruce looked at the defendant's and the other passengers' licenses and prior to observing anything on the floorboard of the truck and after questioning them, he allowed the other passenger to go home as he lived just across the road from where they were stopped. Officer Cruce did not get them out of the car on the passenger side to search for weapons upon their person or the truck as he said he did not feel the need for this as no moves were made to arouse his suspicion. Officer Cruce stated that the passengers left the door open when they got out and after checking their drivers license and talking to them he then noticed a box on the floor of the truck. He shined his flashlight inside the truck and saw these items and an ink pad partially under the seat with the letters "Fowler Drive School" on it. The officers then searched the truck on the inside and found some items that apparently came from Fowler Drive School. The occupants denied any wrongdoing and the officers called and had someone check the school and they reported that there was no sign of a break-in. The officers then got the driver and defendant to go back to the school, some several miles, and the defendant was placed in the rear seat of the police car and taken to the school.

In the case of Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081) (1961) the court held: "All evidence obtained by searches and seizures in violation of the Federal Constitution is inadmissible in a criminal trial in a state court."

It is the writer's contention that this case is a perfect illustration of an illegal search and seizure and the evidence obtained from the truck should have been barred by the court.

Carroll v. United States, 267 U. S. 132 (45 SC 280, 69 LE 543) (1925) states that, "[t]he right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." In the case before us the officers did not know or suspect that the truck contained stolen goods nor that any passenger had committed a crime. Continuing, the Carroll case, supra, said, " '[i]f the facts and circumstances before the officer

are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient.' " No one would contend that the officers in this case had any idea that the defendant had committed a crime. In the facts set out above the officers really stated two reasons for stopping them and their actions were proof of each. First, to check the license of the driver; this he did. Secondly, the fact that he continued to question the driver after the license check without a reason; the fact that he "wondered what they were doing"; the fact that he stopped the truck for reasons he gave of burglaries in the past several months as well as a license check; the fact that no burglaries had been reported that night; the fact that the *second* officer checked the license of the passengers which is not a part of a drivers license check; the fact that he questioned the passengers after this, all is proof of the fact that the truck was not stopped in the beginning for a license check only. Anything beyond a check of the license of the driver was illegal and unwarranted under the facts in this case. The passengers were not causing any trouble nor were they driving. The officer on the passenger side saw the ink pad after he demanded of them their drivers license and had talked to them. The defendant and one state witness testified that the officer ordered them out of the truck; he denies it. After checking their license he still questioned them before he shined his flashlight into the truck. One was allowed to go to his home just across the road, so certainly they had a reason to be there; he lived there.

The line must be drawn between mere suspicion and probable cause, otherwise every traveler on the highway may be stopped and searched at the officers' whim, caprice or mere suspicion. Viewing the evidence in this case, in its *most favorable light* for the state, the best that can be said is that the officers just wanted to see who was in the truck, where they had been, where they were going and as Officer Cruce stated, "If you are picking somebody up at that particular time of night the proper procedure is to check inside of the cab and see if there is anybody in there and what is going on." This is not what you do when you stop for a license check only.

A case that fits this almost to a "T" is *Brooks v.*

*State,* 129 Ga. App. 109 (198 SE2d 892). In this case, a man and woman at 2:30 a.m. were observed by a deputy sheriff turning into a side road and the officer followed and stopped them. When the defendant got out of the car the officer observed a plastic bag sticking out of his shirt pocket. The sheriff removed the bag and it contained marijuana. Judge Deen, in reversing the trial court on its denial of defendant's timely motion to suppress had the following to say: "Momentary detention and questioning are permissible if based upon specific and articulable facts which, taken together with rational inferences from these facts, justify a reasonable course of inquiry not based on mere inclination, caprice, or harassment. The mere fact that a motor vehicle turns off from a main highway to a side road at night [2:30 a.m.], there being no rational ground for suspicion that it is connected with any law violation, does not justify its pursuit and detention. An envelope of marijuana found on the driver's person under these circumstances should not be allowed in evidence over a proper motion to suppress." This case is stronger than this case before the court. The officer observed the drug packet protruding from his shirt pocket before any checking was made. There was no more reason to check the "driver's license" here than to check the presence of the parties in the *Brooks* case, supra, certainly there was no reason to check the passengers' drivers license. The writer of this opinion realizes that the court in *Brisbane v. State,* 233 Ga. 339, 343 (211 SE2d 294) states: "This court has held that 'the state can practice preventative therapy by reasonable road checks to ascertain whether man and machine meet the legislative determination of fitness.' *State v. Swift,* 232 Ga. 535 (207 SE2d 459) (1974). Code Ann. § 92A-9906 makes it a criminal offense for a *driver to refuse to exhibit his license* to a police officer upon request. Of course, the license check contemplated by this statute should not be used as a subterfuge to detain citizens for the purpose of searching their automobiles when they are under no founded suspicion." (Emphasis supplied.) The officers here stated they had no suspicion of person or automobile, just stopped for license check. The license check is to be confined to the *driver* only, as no one else is required to have one and to demand a license check of the

other occupants of the car is a subterfuge and harassment of the passengers. The defendant was a passenger and there was no law violation by the driver nor any suspicion or report on the truck nor any report of a crime in that area that night or in the recent past. In addition to this, one of the passengers lived across the road from where the truck was stopped. Finally, there was more than a momentary detention because after the license and tag check, which cast no suspicion on the driver or the passengers, the officers continued to question the driver and checked the drivers license of the two passengers in addition to questioning them, after which they permitted one passenger to cross the road to his home, then the officers looked at the ink pad and other articles inside the truck.

The case of *State v. Smith,* 137 Ga. App. 101 (223 SE2d 30) is even a stronger case than the one before this court. In this case the defendant and co-defendant were seated in a car on a street at approximately 1:00 p.m. and it was noted the car was filled with smoke and the two occupants were smoking a cigarette. The officer testified that he was investigating a couple of burglaries which had occurred in the neighborhood earlier that morning. He decided they were "suspicious persons." The officer came up to the car where defendant was seated and directed the defendant to let the window down or open the door. The defendant opened the door and the officer smelled marijuana and observed a cigarette burning in the ashtray. Upon a search of the vehicle the officer found marijuana in the car. This court in holding that the trial court was correct in sustaining defendant's motion to suppress the evidence so obtained cited the *Brooks* case, supra, as well as stating: "The Supreme Court of the United States has held that when a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person within the meaning of the Fourth Amendment. Terry v. Ohio, 392 U. S. 1, 16 (88 SC 1868, 20 LE2d 889) (1968). To justify a warrantless intrusion of this nature, the state must be able to point to specific and articulable facts, which, together with rational inferences drawn therefrom, reasonably warrant the intrusion. [Cits.]" *State v. Smith,* supra, p. 102.

The court went on to say that when the officer

instructed the defendant to either roll down his window or open the door, the officer "seized" the defendant within the meaning of the Fourth Amendment. The officer in the case before the court "seized" the defendant when he directed him to show him his drivers license which was a violation of his Fourth Amendment rights because he was not the driver and there was no other reason given for so doing. The officers stated, themselves, they were not free to go until they were released by them and they did not release them as soon as the license of the driver was checked.

The case of *Kelly v. State,* 129 Ga. App. 131 (198 SE2d 910) sustains the contention that where there is no warrant, no criminal offense committed in the presence of the officer during his observation of the vehicle nor one scintilla of any unlawful or criminal activity, one may not be arrested. The court concluded that rumor, suspicion, speculation, or conjecture is not sufficient and where there was no contraband in sight, no arrest was legal. There was no contraband in sight here until the illegal invasion of privacy and arrest of the defendant by demanding that he produce his drivers license.

Therefore, in the words of *Brooks,* supra (p. 111), "And, where no circumstances at all appear which might give rise to an articulable suspicion (less than probable cause, but greater than mere caprice) that the law has been violated, the act of following and detaining a vehicle and its occupants must be judged as an impermissible intrusion on the rights of the citizen. Where this occurs, the penalty exacted by the law is that evidence turned up as a result of such intrusion may not be introduced against the defendant on the trial of his case." From the cases cited by the majority in support of their opinion, upon careful reading, it may be seen that they are easily distinguishable from this case. The motion to suppress should have been granted.

2. The majority in Division 2 of their opinion state that the "plain view" doctrine is applicable. With this the writer cannot agree.

In the case before us the Fourth Amendment is applicable and has not been complied with. Consequently, the "plain view" doctrine should never have come into

play.

The ink pad that triggered the illegal search and seizure here came into "plain view" by virtue of an illegal act on the part of an investigating officer; therefore, it and all other evidence, was inadmissible because it was obtained in violation of the defendant's Fourth Amendment rights.

Coolidge v. New Hampshire, 403 U. S. 443 (91 SC 2022, 29 LE2d 564) (1971) states: "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a *few* specifically established and well-delineated exceptions.' The *exceptions* are *'jealously and carefully drawn,'* and there must be *'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'* *'[T]he burden is on those seeking the exemption to show the need for it.'* (Emphasis supplied.) In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won — by legal and constitutional means in England, and by revolution on this continent — a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important."

Coolidge, supra, goes on to say, "[o]f course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."

You must have a prior valid entry in order for the doctrine to apply. The only valid entry here was to check the license of the driver. When that was completed the

defendant and the driver should have been released. But they were not. The officers proceeded to question the driver further and to require a license check of the passengers (it might be noted here you do not need a drivers license to be a passenger in an automobile) and after that questioned them.

Also, the officers had someone check the school building and the report came back that there were no signs of a break-in. Even after that the officers placed the defendant in the police car and went back to the school to look for evidence of a break-in at which time they found an open window. It has been held over and over that the fruits of a search do not validate an otherwise invalid search.

The following statements from the officers on the scene are proof positive that they proceeded beyond that point that they were legally allowed to go.

"The court: At anytime did any person in the truck, before or after you stopped them, do anything unusual?

"A. It is according to what you term unusual, your Honor, I don't think that they did anything, I really don't know how to explain it. I don't think they. I would have to say no, they didn't do anything unusual. In general, no. They acted at first when we stopped them, very normal." Then later the officer answered: *"Sometimes it is correct, not all the time, I can't say that I suspected that they had just committed some kind of crime."* (Emphasis supplied.)

In view of the testimony of the arresting officers and the facts in this case, no type of evidence came into "plain view" of the officers through any legal means. The officer checking the drivers license saw nothing. It was the officer on the passenger side, as a result of his illegal action of requiring the passengers to prove their identity by checking their drivers license when he had no reason to under the facts of this case, who saw the ink pad after questioning them.

The case of *State v. Swift,* 232 Ga. 535 (207 SE2d 459) states with regard to a road block to check drivers license: "The purpose of the check is to determine the present, not the past: *is* the car, *is* the driver now fit for further driving"? It is not to check the drivers license of the passengers and when in the process of checking the license of the passengers, which he had no right to do, it

caused him to see an ink pad in "plain view," he did so as a result of an illegal search and seizure in violation of the Fourth Amendment. Consequently, this evidence has been sighted and obtained illegally and the timely motion to suppress should have been granted.

I am authorized to state that Presiding Judge Deen and Judge Clark concur in this dissent.